IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Cherie Antoinette Hobson, ) | |
| ) | Civil Action No. 6:14-3906-TLW-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on July 12, 2010, alleging that she became unable to work on January 25, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On September 7, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Melissa Stewart, an impartial vocational expert appeared on February 22, 2013, considered the case *de novo* and, on April 9, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the

Appeals Council denied the plaintiff's request for review on August 7, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> (2) The claimant has not engaged in substantial gainful activity since January 25, 2010, the alleged onset date (20 C.F.R. § 404.1571 *et seq*).
>
> (3) The claimant has the following severe impairments: fibromyalgia, chronic fatigue syndrome, depression, and generalized anxiety (20 C.F.R. § 404.1520(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R § 404.1567(b) except she would be restricted to a low production work environment and simple, routine, repetitive tasks. Additionally, she requires a sit/stand option with the ability to sit/stand at will.
>
> (6) The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7) The claimant was born on August 20, 1970, and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 C.F.R. § 404.1563).
>
> (8) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).
>
> (9) Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

> (10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).
>
> (11) The claimant has not been under a disability, as defined in the Social Security Act, from January 25, 2010,, through the date of the decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 39 years old on her alleged disability onset date and 42 years old on the date of the ALJ's decision. She has two years of college education (Tr. 52) and has past relevant work experience as a mortgage loan officer and claim adjuster (Tr. 40).

### *Medical Evidence*

In January 2009, the plaintiff began to complain of episodes of dizziness (Tr.. 251). Initial impression was a bad reaction to the drug Lexapro. It was also thought that she may be suffering from anxiety symptoms. By June 2009, the plaintiff was complaining of moderate depression symptoms. She reported that her mood cycled at times, and while she reported temper issues, she did not have any suicidal thoughts. Her primary care doctor was not comfortable prescribing medication due to her history of adverse reactions, and she was referred to a psychiatrist (Tr. 248).

On January 26, 2010, the plaintiff presented to Metrolina Medical Associates with "all over pain" (Tr. 329-30). She reported a family history of fibromyalgia. Her pain seemed "more muscular than joint" and she was noted to be "very tender to touch" over her shoulders, back, and arms. She was referred for blood work. Several days later, on January 29, 2010, the plaintiff was still having chronic all over body pain. Skelaxin was not helping. Her pain was "probably secondary to fibromyalgia," and she was referred to a rheumatologist (Tr. 327-28).

On February 26, 2010, the plaintiff was seen again at Metrolina and reported that she had kept her appointment with a rheumatologist and had been placed on Amrix (Tr. 325-26).

By March 2010, the plaintiff had established care at Joint and Muscle Medical Care with Alireza Nami, M.D., a rheumatologist. She was followed for fibromyalgia and reported that she had improved since starting the medication Amrix. She had walked her dog twice since her last visit. On exam, she was tender in the jaw, sternum, shoulders, elbows, wrists, hips, and knees. The plan was to continue Amrix, and she was referred for physical therapy (Tr. 316-18). On March 29, 2010, Amrix was decreased because it was not effective at a higher dose, and the plaintiff was started on Pristique (Tr. 313-15).

On April 2, 2010, the plaintiff presented to Dr. Nami with shoulder pain and received a trigger point injection. It was recommended that she avoid caffeine and try to get regular exercise (Tr. 311-12). On April 26, 2010, she reported that the injection had given her two weeks of relief (Tr. 308-10).

In May and June 2010, Dr. Nami administered iontophoresis treatments to the plaintiff's right hip (Tr. 299, 300, 302, 304). On June 11, 2010, the plaintiff reported that the treatments had helped quite a bit. Nonetheless, she reported that her fatigue was still quite severe. On exam, she was tender at multiple joints as before. Her Neurontin prescription was increased. The plan for her was to haver a trigger point injection and a trial of Nuvigil (Tr. 295-97).

On August 13, 2010, the plaintiff presented to Dr. Nami with a flare up of her fibromyalgia pain. She was given another lidocaine injection (Tr. 291-93).

On October 1, 2010, the plaintiff was seen at Dr. Nami's office complaining of severe fatigue. She received another trigger point injection (Tr. 289-91)

The plaintiff was treated by two psychiatrists, James E. Lee Jr., M.D., with Ascension Behavioral Healthcare, and Devendra C. Shah, M.D., with Providence

Behavioral Health (Tr. 256, 392). When the plaintiff saw Dr. Lee on January 31, 2011, she stated that she was looking to re-establish a relationship with a psychiatrist (Tr. 338). Dr. Lee observed that the plaintiff's mood was good, and she was casually dressed, displayed normal psychomotor activity, had a euthymic affect, had normal speech, displayed linear and goal directed thought form, denied suicidal or homicidal ideation, and possessed fair insight and judgment (Tr. 256, 338). Dr. Lee diagnosed major depressive disorder, rule out bipolar disorder, and personality disorder not otherwise specified ("NOS"). Dr. Lee also gave the plaintiff a Global Assessment of Functioning ("GAF") score of 65[1] (Tr. 256, 338).

On February 9, 2011, Alfred Nicholas DePace, Ph.D., conducted a consultative examination (Tr. 258-62). He observed that the plaintiff drove herself to the examination and was not accompanied. He also observed that the plaintiff was nicely dressed and appropriately groomed. She was alert and oriented in all spheres and aware of current events. Her psychomotor behavior and the rate, volume, and production of her speech were both within normal limits. She demonstrated a full range of affect, laughing and smiling frequently and enjoying the interpersonal give-and-take associated with the evaluation. The plaintiff's thought processes were goal-directed and coherent, and she demonstrated an intellect that was average or higher. The plaintiff denied having a history of perceptual disturbances or problematic thought content such as suicidal or homicidal thinking or paranoia. The plaintiff was cooperative and maintained good eye contact. She followed directions without any significant difficulties and was able to state her perspective

---

[1] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

7

clearly on questions asked of her. The plaintiff displayed no significant struggles with anxiety or sadness (Tr. 260).

Dr. DePace diagnosed the plaintiff with an adjustment disorder with depression, chronic (Tr. 260). Dr. DePace also stated that "[i]nterpersonally, the claimant reports a long history of being able to appropriately and effectively interact with others and her interactions with me suggest that she clearly has the ability to understand the give-and-take associated with appropriate and effective social interaction" (Tr. 261).

On February 28, 2011, the plaintiff returned to Dr. Lee. At this time, the plaintiff's mood was tired. She maintained a casual appearance, displayed normal psychomotor activity, had a calm affect, had normal speech, displayed linear and goal directed thought form, denied suicidal or homicidal ideation, and possessed fair insight and judgment. Dr. Lee diagnosed the plaintiff with major depressive disorder, recurrent episode, mild degree (Tr. 337). The plaintiff followed up with Dr. Lee on March 29, 2011. She felt "a little better," tolerated the medications, and felt "better since starting medications." She was in a "pretty good" mood (Tr. 336). Dr. Lee diagnosed the plaintiff with major depressive disorder, recurrent episode, mild degree (Tr. 337).

On March 25, 2011, the plaintiff saw Sheneque White, PA-C at Metrolina (Tr. 319-20). Ms. White observed that the plaintiff was in no apparent distress, had normal musculature, had no skeletal tenderness or joint deformity, had normal appearing extremities, and displayed no unusual anxiety or evidence depression (Tr. 320). The plaintiff reported that she had been seeing Dr. Nami for a year without any pain relief from the treatments or medications (Tr. 319-20). Dr. Nami had diagnosed the plaintiff with fatigue, depression, fibromyalgia, arthalgias, myalgias, and bilateral trochanteric bursitis (Tr. 279, 282, 285, 288, 290, 297, 310, 315). The plaintiff continued to have pain in her muscles, which prevented her from getting out of bed and doing her chores. She asked to be referred to another rheumatologist and was referred to Charles Lapp, M.D. (Tr. 319-20).

On April 7, 2011, the plaintiff presented to the Hunter-Hopkins Center for an evaluation by Dr. Lapp (Tr. 341-49).  Her chief complaint was chronic fatigue.  This had begun seven years ago, but had escalated recently.  By 2010, she was experiencing pain throughout her body and eventually had to leave work.  Since her mother was treated for fibromyalgia by Dr. Nami, she had also been evaluated there.  She had been treated with multiple modalities including medications, trigger point injections, education, and pool therapy.  Her worst symptoms were profound fatigue sleep disruption, headaches, and cognitive issues.  She admitted that she made so many errors in handling the family bank account that it was eventually closed down.  Pain was worst in the "coat hanger area."  She treated her pain with Amrix and a heating pad.  She had been given Lortab once in the emergency room, but had an adverse reaction.  She reported that she got six to seven hours of sleep per night, but did not wake refreshed.  She had daily headaches, usually in the afternoon.  She could perform two to three hours of desk work per day, but required rest periods.  She described very little social interaction or activity.  Exam showed an "animated, delightful young woman."  Dr. Lapp noted axial tenderness, tenderness in the "coat hanger area," severe sacroiliac joint tenderness, universal tender points of fibromyalgia (18), and a Russell Manual Tender point Count of 40, indicating severe fibromyalgia.  Tinel's sign was positive on the right.  Assessment was fibromyalgia, affective disorder, and anxiety with a GAF of 60-65.  Cardiopulmonary exercise testing and neuropsychiatric screening were scheduled for later that day.  In addition to exercise and various practical coping mechanisms (pacing, setting limits, establishing a routine), Dr. Lapp increased the plaintiff's Neurontin and prescribed Tramadol.  The plaintiff had normal muscle tone and no atrophy, and blood testing was normal (Tr. 342).

On June 21, 2011, the plaintiff returned to Dr. Lee for a routine follow up.  At this time, the plaintiff's mood was "tired but ok."  She maintained a casual appearance, displayed normal psychomotor activity, had a calm and tired affect, had normal speech,

9

displayed linear and goal directed thought form, denied suicidal or homicidal ideation, and possessed good insight and judgment. Dr. Lee diagnosed the plaintiff with major depressive disorder, recurrent episode, mild degree (Tr. 335, 432).

The plaintiff returned to Dr. Lapp on June 28, 2011. She had had a difficult week because she had run out of Lunesta and was not sleeping well (Tr. 340). She was pacing herself daily and setting limits, using her pedometer and journaling pain. B12 supplements were helping with fatigue. She had tried to increase her Neurontin, but felt numb. Her pharmacy had refused to fill her Tramadol prescription due to a possible reaction with Cymbalta. Dr. Lapp noted that cardiopulmonary testing had revealed a low aerobic work capacity and confirmed an extremely low level of physical ability and difficulty coping with mental, emotional, or physical stressors. Computerized neuropsychiatric testing demonstrated deficits in reasoning and severe deficits in memory and psychomotor speed. Assessment was as before, with the addition of carpal tunnel syndrome, clinically, on the left. Dr. Lapp refilled Lunesta and Neurontin, instruction to fill Tramadol for use if needed, and that it was "imperative to increase activity levels" (Tr. 340).

On September 30, 2011, the plaintiff presented for treatment at Box Arthritis and Rheumatology for treatment of joint and muscle pain. She complained of pain primarily in the shoulders, feet, hands, and arms. She had difficulty falling and staying asleep. It was noted that injections from Dr. Nami had not helped. She was walking her dog daily for 15 minutes. She went to the gym to talk on the treadmill once per week – twice on a good week. Water therapy had helped. Cervical spine x-rays showed straightening of the normal lordotic curvature of the cervical spine suggesting underlying muscular spasm or ligamentous injury as well as mild degenerative disc disease (Tr. 373-76). She returned to Box Arthritis and Rheumatology on November 17, 2011, and reported that Flexeril had helped some but not enough (Tr. 370-72). Impression was back ache and unspecified myalgia/myositis. She was advised to exercise (Tr. 371, 375, 474, 479).

On October 4, 2011, the plaintiff saw Dr. Lee. She was "beginning to feel a little better," tolerating her medications and not feeling depressed. She maintained a neat appearance, displayed normal psychomotor activity, was in a happy mood, had a euthymic affect, had normal speech, displayed linear and goal directed thought form, denied suicidal or homicidal ideation, and possessed fair insight and judgment. Dr. Lee again diagnosed the plaintiff with major depressive disorder, recurrent episode, mild degree (Tr. 430).

The plaintiff last treated with Dr. Lee on November 3, 2011. He noted that the plaintiff's fibromyalgia pain had decreased and was not depressed or anxious. She was tolerating her medications (Tr. 428).

The plaintiff did not return to Dr. Lapp's office until January 27, 2012, "due to finances" (Tr. 364-65). She reported she was stable and had to pace carefully. For example, after cooking just part of a Thanksgiving meal, she was in bed for an entire week and was unable to shower for several days. Her main issues were pain and fatigue. She had tried to exercise by walking 15 minutes daily, but any increase above that triggered prolonged relapses. Her medications kept pain at a five to six out of ten. Tramadol had caused a severe itch, so she had to stop taking it. She related severe dyscognition, she had left her son waiting at school for a ride, had difficulty with conversation, and needed lots of reminders in general. She drove only locally due to lack of attention and reflexes. She had 16 tender trigger points on exam that day. Otherwise her musculoskeletal and neurological examinations were normal. Tinels sign was positive bilaterally. She was directed to keep up activity and was encouraged to seek chiropractic or massage treatments for her neck and shoulders. Dr. Lapp advised the plaintiff to return for treatment in six to twelve months (Tr. 365, 426).

In February 2012, the plaintiff sought treatment with Dr. Shah at Provident Behavioral Health for depression. Upon mental status examination, the plaintiff was anxious at times, but was alert, cooperative, dressed nicely, and well groomed and had on

11

makeup. She had an appropriate affect, was not a danger to herself or others, and was not psychotic. She was oriented times three, had fair insight and judgment, displayed an average fund of knowledge, was able to recall three out of three objects after five minutes, and was able to perform serial threes without error. She reported trouble with memory and concentration as well as energy issues. Initial impression was generalized anxiety disorder, major depressive disorder (recurrent/moderate), fibromyalgia, degenerative joint disease, and her GAF was estimated at 55. She was to continue Cymbalta, Sonata, and Neurontin, and she was referred for counseling (Tr. 392-93).

On April 11, 2012, the plaintiff saw Dr. Shah at Provident and reported that she was disorganized with poor memory. She displayed none to mild symptoms from her mental impairments with the exception of generalized anxiety, which was mild to moderate in severity. She also had some degree of difficulty with her attention span and concentration as well as her mood and affect (Tr. 435).

On June 5, 2012, the plaintiff visited the emergency room for abdominal pain. A neurological exam revealed no focal neurological deficits, intact cranial nerves, normal motor activity, and a normal gait. Her speech was normal. She was cooperative and displayed an appropriate mood and affect (Tr. 396).

On July 12, 2012, she returned to Provident and reported that she had not started Buspar nor counseling. Dr. Shah made similar observations as in April and added that the plaintiff experienced sleep disturbance, which was mild to moderate in severity. The plaintiff reported that a typical day involved waking up, making breakfast for her kids, resting, doing light household tasks, making dinner, and occasionally going to the pool. She was irritable due to her children being home for the summer (Tr. 433)

On August 20, 2012, the plaintiff visited primary care physician Rajesh H. Kedar, M.D., at Metrolina. He reported that her depression was stable (Tr. 441).

The plaintiff was treated in the emergency room at Carolina Medical Center on February 15, 2013, for anxiety (Tr. 493-515). During a mental status examination, the plaintiff displayed normal attention and concentration, showed no recent or remote memory impairment, speech was normal in rate, tone, and volume, and had logical and goal-directed thought processes. William R. Hartnagel, M.D., diagnosed anxiety disorder NOS and assigned the plaintiff a GAF score of 60, which is consistent with mild to moderate mental limitations(Tr. 505-506).

***Appeals Council Evidence***

On May 12, 2011, Dr. Lapp wrote a letter in response to an adverse decision by a medical consultant (Dr. Shirley Conibear) who was asked by the plaintiff's long term disability insurance carrier to address whether the plaintiff's medical information supported functional limitations beyond March 18, 2011. Dr. Lapp stated that the consultant's findings were "contrary to common sense and the objective data." He noted that the plaintiff displayed the objective findings laid out by the American College of Rheumatology for a diagnosis of fibromyalgia including fatigue, muscle pain, and difficulty thinking, concentrating, and remembering. He stated that her peak performance on cardiopulmonary exercise testing was not indicative of someone who could truly function, even in a sedentary position. He further stated that post-exertional malaise, cognitive difficulties, sleep disruption and pain, together, precluded "regular, sustained, or predictable work activity." He countered a finding of "non-compliance" with Lyrica characterizing it as uncomfortable and possibly dangerous. Dr. Lapp opined that neurocognitive testing indicated only average functioning in attention, multitasking, and executive functioning, and this corroborated her subjective complaints. Finally, Dr. Lapp noted that, with exercise testing, the plaintiff's core temperature did not rise as it should have, indicating severe impairment. He summarized the plaintiff's complaints as reasonable based on her history, "provided to

several physicians consistently over time, physical examination, exercise testing, and neurocognitive screening" (Tr. 488-90).

Neither Dr. Lapp's letter nor Dr. Conibear's report were provided to the ALJ, who issued his decision in April 2013. However, the plaintiff submitted Dr. Lapp's May 2011 letter to the Appeals Council[2] (Tr. 245-47, 488-90). The Appeals Council considered the letter, along with other evidence submitted by the plaintiff, and found that it did not provide a basis for changing the ALJ's decision (Tr. 2). The letter was made part of the administrative record (Tr. 5, 488-90).

***Hearing Testimony***

During the hearing, the plaintiff testified that she last worked in January 2010. At that time, she left work because of severe pain (Tr. 54). The plaintiff testified that her fibromyalgia had "pretty much changed my life" and that she was "grieving who I used to be" (Tr. 55). She no longer cooked, took her children places, or participated in physical and social activities like she used to. She stated that it had "destroyed me" socially because she was fatigued, in pain, and depressed. She felt extremely isolated. She explained that she did not always like to be around people, that she spent a lot of time resting, and that she tended to cancel plans (Tr. 57). She had become more moody and irritable whereas she used to be a consistently positive person (Tr. 58).

In terms of her pain, the plaintiff testified that she hurt in the "coat hanger area" across the back of her shoulders (Tr. 56). Sometimes the pain migrated to her hip, feet, and fingers. She rated her pain as a seven or eight on a ten point scale. She was also treated for depression and anxiety. She coped by talking to her family, praying, and trying to stay positive. A psychiatrist managed her medications, and she was working on finding a counselor (Tr. 57).

---

[2]The Commissioner states in her brief that the "[p]laintiff has yet to produce Dr. Conibear's report" (def. brief 9).

14

Due to her disease, the plaintiff had to pace herself (Tr. 59). When she engaged in more activity, even non-strenuous activity, she would "pay for it" later. Weather and stress also affected her pain levels (Tr. 60). She testified that she spent seven to eight hours in bed during the daytime (Tr. 61). She woke up in the mornings, took her children to school, ate breakfast, and got back in bed (Tr. 62). She might make herself a sandwich for lunch or, if she could not, she might call a family member to bring her some food. She listened to audio books or podcasts during the day because she was not able to focus on the television or read more than a few paragraphs of a book (Tr. 63). She no longer did chores and relied on her mother and her teenage son (Tr. 64). Once or twice a week she would go pick her children up from school, which was less than two miles from her home (Tr. 65). The plaintiff no longer handled the family's finances. She did not drive much except to go to the doctor. The plaintiff described difficulty with memory and had even left her son at school once. She was no longer supposed to use the stove unless someone else was home. The plaintiff estimated she could walk for ten minutes, sit for 25 minutes, stand for ten minutes, and lift about ten pounds (Tr. 69-70).

## ANALYSIS

The plaintiff argues that (1) remand is appropriate for consideration of evidence submitted to the Appeals Council, and the ALJ erred by (2) failing to consider her impairments in combination and (3) failing to base the residual functional capacity ("RFC") analysis on substantial evidence.

### *Appeals Council Evidence*

The plaintiff first argues that this matter should be remanded for consideration of certain evidence[3] submitted to the Appeals Council. Specifically, as more fully set forth

---

[3]The plaintiff submitted other documents to the Appeals Council, but the only document upon which the plaintiff seeks remand is the letter from Dr. Lapp (pl. brief 10-12).

above, the plaintiff submitted to the Appeals Council a letter dated May 12, 2011,[4] in which Dr. Lapp stated that the plaintiff displayed the objective findings laid out by the American College of Rheumatology for a diagnosis of fibromyalgia including fatigue, muscle pain, and difficulty thinking, concentrating, and remembering.  He stated that her peak performance on cardiopulmonary exercise testing was not indicative of someone who could truly function, even in a sedentary position.  He further stated that post-exertional malaise, cognitive difficulties, sleep disruption and pain, together, precluded, "regular, sustained, or predictable work activity" (Tr. 488-90). The Appeals Council found the evidence did not provide a basis for changing the ALJ's decision and made the letter part of the administrative record (Tr. 2, 5, 488-90).

The law provides that evidence submitted to the Appeals Council with the request for review must be considered in deciding whether to grant review " 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.' " *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir.1991) (en banc ) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir.1990)). Evidence is new "if it is not duplicative or cumulative." *Id*. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* The United States Court of Appeals for the Fourth Circuit has explicitly held that "[t]he Appeals Council need not explain its reasoning when denying review of an ALJ decision." *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir.2011). The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application

---

[4]The plaintiff does not indicate why Dr. Lapp's letter was not submitted to the ALJ. However, when a claimant seeks to present new evidence to the Appeals Council, she is not required to show good cause for failing to present the evidence earlier. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir.1991) (en banc ); cf. 20 C.F.R. § 404.970(b).

of the correct legal standard. *Id*. at 704. "In making this determination, we 'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" *Id.* (quoting *Wilkins*, 953 F.2d at 96).

The plaintiff relies on *Meyer*, arguing that remand is required for consideration of Dr. Lapp's opinion (pl. brief 10-12). The ALJ in *Meyer* issued a decision denying benefits and noted therein that Meyer failed to provide an opinion from his treating physician. 662 F.3d at 702. When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician that detailed Meyer's injuries (from a fall) and significant physical restrictions. The Appeals Council summarily denied review but made the letter part of the administrative record. The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician, and thus the report should be accorded only minimal weight. The district court adopted the Report and Recommendation. *Id.* at 704. The Court of Appeals, however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report filled an "evidentiary gap" emphasized by the ALJ. *Id*. at 707. The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered, noting that the treating physician's opinion corroborated the opinion of an evaluating physician, which had been rejected by the ALJ, but other record evidence credited by the ALJ conflicted with the new evidence. *Id.* The court concluded: "Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance." *Id.*

The Commissioner attempts to distinguish *Meyer*, arguing as follows:

> The only wrinkle in *Meyer*, which ultimately occasioned the remand in that particular case, was a narrow one. Specifically, the unusual facts of *Meyer* led the Court of Appeals to find itself unable to test the Commissioner's final decision for substantial evidence, even though the substantial evidence standard is slight. This was because in the fact-pattern presented in *Meyer*, the ALJ highlighted the *lack* of treating source opinion evidence as a reason for his finding of non-disability – and treating source evidence was precisely the evidence that Plaintiff later submitted post-hearing. . . .

(Def. brief 13) (emphasis in original).

However, the "wrinkle" presented in *Meyer* is also present here. The ALJ stated as follows in his assessment of the plaintiff's RFC:

> As for the opinion evidence, the record is silent as to any relevant medical opinion regarding the claimant's alleged impairments. The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. Furthermore, given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor.

(Tr. 40).

Here, as in *Meyer*, in light of the new evidence submitted to the Appeals Council, the undersigned cannot determine whether the decision is supported by substantial evidence because the plaintiff has now produced an opinion from a treating physician[5] indicating that her limitations are greater than those determined by the ALJ, filling an evidentiary gap identified by the ALJ (*see* Tr. 40). *See Meyer*, 662 F.3d at 707.

---

[5] The ALJ should also consider Dr. Lapp's June 28, 2011, treatment notes (Tr. 340), which are not discussed in the decision (*see* Tr. 38). Dr. Lapp noted that cardiopulmonary testing had revealed a low aerobic work capacity and confirmed an extremely low level of physical ability and difficulty coping with mental, emotional, or physical stressors. Computerized neuropsychiatric testing demonstrated deficits in reasoning and severe deficits in and psychomotor spread (Tr. 340). This testing is referenced in Dr. Lapp's May 2011 letter (Tr. 488-90)

Accordingly, the case should be remanded for consideration of this new and material evidence. *See Martinez v. Barnhart*, 444 F.3d 1201, 1207 (4th Cir. 2006) (stating that Appeals Council implicitly determined that evidence was new and material when it incorporated it into the record).

***Remaining Allegations of Error***

In light of the court's recommendation that this matter be remanded for further consideration as discussed above, the court need not address the plaintiff's remaining allegations of error. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). On remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration. *Hancock v. Barnhart*, 206 F.Supp.2d 757, 763–764 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Specifically, the ALJ should consider the plaintiff's remaining arguments that he erred in failing to consider her impairments in combination at the listing stage and in the RFC analysis (pl. brief 12-13); in failing to consider whether she can maintain her RFC on a regular and continuing basis due to the waxing and waning nature of fibroymyalgia (*id.* 13-14); and in failing to properly evaluate her credibility by requiring objective evidence to establish the severity of her pain and in overstating her daily activities (*id.* 14-16).

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

January 5, 2016                                   s/ Kevin F. McDonald
Greenville, South Carolina              United States Magistrate Judge